## Smith v. Commonwealth.

March 10, 1939.

T. C. BENNETT for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Appellant was tried and convicted in the Lyon circuit court for the willful murder of Clayton Sloan and his punishment fixed at death. He appeals.

Appellant and Sloan, the deceased, were prisoners confined in the penitentiary at Eddyville, Ky., and were cellmates.

The homicide occurred on the 13th day of June, 1938, at about six o'clock P. M. in the cell where appellant and deceased were confined.

Euless Redden, who was also a prisoner, was the only eye-witness to the tragedy. He testified that he

was out on the walkway where he could see in the cell and looked into the cell and saw deceased lying down on the bunk and saw appellant standing in the cell. He described the commission of the homicide as follows:

"Q. Tell the jury what happened? A. He (deceased) was lying down on the bunk, I don't know what the trouble was, I didn't hear any trouble; he (appellant) stabbed him in the heart with a knife, the first lick killed him, and he took the knife, and cut his head off.

"Q. How many times did he stab him in the heart? A. I did not see but one time.

"Q. Then what did he do with him?

\* \* \* \* \* \*

"Q. Tell what Smith did with the body after he stabbed him? A. He dragged it off on the floor, and left it in the cell.

"Q. How did he cut his head off? A. He took a knife and cut it off.

"Q. How did he do it? All at one lick? A. No, sir, he did not cut it off at one lick, he made several licks at it.

"Q. Where was he lying when he cut his head off? A. When he first cut him he was on the bunk, but he finished cutting it off after he got him on the floor.

"Q. Did he stand up straight? A. No, sir, he was stooped over.

"Q. Tell all about it? A. That is all I know, he cut his head off.

"Q. After he cut his neck with the knife what did he do? A. He had to twist the bone in two.

"Q. Did he take hold of his head with one hand or both hands? A. He took both hands and twisted his head off, he took him by each ear, and twisted his head off.

"Q. After he cut him? A. Yes, sir."

W. J. Buchanan, the Warden of the penitentiary, was informed of the homicide and immediately went to the cell. He said he walked up to the cell door and appellant was standing in the door rolling a cigarette, "I said, 'Have you killed Sloan?' He said 'Yes, I have

cut his head off.' His body was lying catter-cornered of the cell, and his head was any where from eighteen inches to two feet from his body." He said there was no one else in the cell.

Bill Riggsby, another prisoner, was in the corridor of the cellhouse and as he was passing appellant's cell he saw appellant standing in the door and appellant called to Riggsby, saying "You go around there, and tell Mr. Tarr to come here, I have killed this damn s—— of a b——." Tarr, a guard, went to the cell and appellant also told him that he had killed Sloan.

It is also disclosed in the record that appellant was serving two sentences, concurrently, for homicide, the first offense having occurred in Boyd County in 1919, for which he was sentenced to the penitentiary for life, and the second one having occurred in prison after his incarceration, for the first one, and his second victim, as well as the third one now under consideration, also was a fellow convict, for which latter offense appellant was convicted of manslaughter.

Appellant testified in his own behalf and the substance of his story was that the deceased entertained some ill feeling toward him and accused him of telling someone of the prisoners to "punch him (appellant) in the nose." He said he tried to reconcile deceased, telling him that they were good friends and to forget what he had heard or what people had told him. He said he was shaving and all the time deceased was arguing about what he had heard, but he paid but little attention to it, except trying to appease him. In the meantime, he said, somebody came along the walk and called the deceased and he, deceased, walked up to the door but he did not see the person. He intimated that he was of the opinion that the person who called deceased gave him the butcher knife, which was found in the cell. He said deceased continued his conversation and finally grabbed him by the shoulder and shoved him up against the wall. He then described the struggle they had which finally resulted in the death of the deceased. He said he could not remember the details of the tragedy except he and deceased were struggling and fighting. He said he must have fainted—"Everything went black, I can't remember nothing—the next thing I knew I was standing in the middle of the floor." He was asked if he cut deceased's head off and he said he could not say whether

he did or not. He said he had been in prison about 22 years and his health was bad and he could not remember things very well.

Appellant introduced in his behalf a number of prisoners who occupied nearby cells and they testified that just before they heard of the homicide they heard a noise in the cell occupied by appellant and deceased, like someone scuffling.

It is thus seen that the evidence is conflicting, but, of course, it presented a question to the jury. There is no argument or contention on behalf of appellant that the evidence is insufficient to support the verdict. The only ground relied on for reversal is that the court should have continued the case to a later day in the term at which appellant was tried, or to some future term of the court. It appears that the indictment against appellant was returned on the 15th day of August, 1938, and he was arraigned on the following day and informed of the nature and pendency of the action against him, and on the following day the court appointed counsel to represent appellant, and on the next day appellant informed the court that he desired to employ his own counsel, which he did, and his trial was set for Thursday, the following day of the term.

It is stated in brief of appellant that his attorney then "filed" a motion for continuance, which motion was overruled by the court. However, we find no written motion in the record and it is stated in the bill of exceptions that counsel made only an oral motion. But so far as the record discloses no reasons were stated, even orally, in support of the motion. The names of no witnesses were given nor was there any showing what any absent witness would state, nor other showing as to the necessity of a continuance. It is well known under our Criminal Code of Practice, Section 189, that a motion for continuance must be supported by affidavit setting out the reasons for the continuance, and if it be on the grounds of absent witnesses, it must state their names, if known, and what the defendant expects to prove by them. That the motion here made is wholly insufficient is too obvious to require citation of authority.

Perceiving no error or grounds of reversal the judgment is affirmed.

The whole court sitting.